UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| BAYSTATE HEALTH, INC., | ) | |
| | ) | Civil Action No. 3:20-cv-30042-MGM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BAY STATE PHYSICAL THERAPY, P.C., | ) | MEMORANDUM IN SUPPORT OF |
| BAY STATE PHYSICAL THERAPY OF | ) | MOTION FOR PRELIMINARY |
| RANDOLPH, INC., & STEVEN WINDWER, | ) | INJUNCTION |
| | ) | |
| Defendants. | ) | |

Plaintiff Baystate Health, Inc. ("Baystate" or "Plaintiff") moves, pursuant to Fed. R. Civ.

P. 65 and Section 34(a) of the Lanham Act (15 U.S.C. §1116(a)), for the issuance of a

preliminary injunction enjoining defendants Bay State Physical Therapy, P.C., Bay State

Physical Therapy of Randolph, Inc. and the company's CEO, Steven Windwer (together,

"BSPT"), from using the BAY STATE mark, whether or not joined with the generic term

"Physical Therapy," to designate physical therapy or related services in any facility west of

Worcester County in the Commonwealth of Massachusetts.

## I.     INTRODUCTION

Throughout Western New England, the term "Baystate" has an immediate connection, in

consumer's minds, with a particular source of high-quality health care services. Baystate is an

integrated health system and the largest health care provider—as well as one of the largest

employers—in Western Massachusetts.  Baystate operates Baystate Medical Center, Baystate's

flagship teaching hospital, Baystate Children's Hospital, three community hospitals and a

network of more than eighty medical practices.  Baystate has operated under the BAYSTATE

brand since 1976 and has continuously used and promoted that mark for more than forty years. As a result of Baystate's efforts and quality,  the BAYSTATE trademark is regionally famous for health care services provided by or with the oversight of Baystate. Those services include Baystate physical therapy services.

In November 2019, defendants BSPT, who had previously confined themselves to the Greater Boston area, began to offer health care-related services in Springfield, Massachusetts under the name BAY STATE PHYSICAL THERAPY.  BSPT did this despite its knowledge that Baystate has been continuously using the BAYSTATE mark to identify its health care services since 1976 in the Greater Springfield area, and despite knowing that Springfield, Massachusetts is the epicenter of the Western Massachusetts community of consumers relying upon health care services denoted by the BAYSTATE brand.

As discussed below, because Baystate has been using the BAYSTATE mark in Western New England to designate its health care services for more than forty years, because BAYSTATE is a strong, incontestable and regionally famous mark that is immediately connected in the minds of consumers with a specific source of quality health care services, and because consumers of rehabilitative and physical therapy services in Springfield, Massachusetts are already exhibiting actual confusion as to the origin of the services offered under BSPT's mark, Baystate is likely to succeed on the merits of its claims against BSPT.  For these reasons, and because the resultant consumer confusion will continue to irreparably harm Baystate, this Court should immediately enjoin BSPT, before it causes further consumer confusion, from using the BAY STATE trademark, alone or in combination with "Physical Therapy" or any other term to designate its health care-related services in Springfield, Massachusetts and any county west of Worcester County going forward.

II.     **FACTS**

    A.  **Consumers In Western New England Have Long Understood That Baystate Is the Source of Health Care Services Provided Under the BAYSTATE mark.**

       Baystate began to use the BAYSTATE mark in association with health care services more than 40 years ago, in 1976, when Medical Center of Western Massachusetts and Wesson Memorial Hospital merged to form Baystate Medical Center.  *See* Ex. 24.  Plaintiff has since used the mark BAYSTATE to identify its health care services to existing and prospective patients, vendors, medical providers, and the public at large.  Smith Aff. ¶ 4.  Such services include the provision of physical therapy and/or rehabilitative services, which Baystate offers at eight locations in Western Massachusetts. Maloney Aff. ¶ 4.  These locations surround and are in close proximity to BSPT's newly-opened Springfield facility.  *See, e.g.*, Ex. 36.

       Baystate has invested heavily to establish its BAYSTATE mark as its most important trademark for its services. This has included spending millions of dollars for marketing, advertisements, and signage. Smith Aff. ¶ 2.  Baystate has expended significant resources to obtain protection for its BAYSTATE mark, and a family of related marks, by securing registrations with the Commonwealth of Massachusetts and the United States Patent and Trademark Office ("USPTO").  *See* Ex. 1.  For example, on October 22, 2001, Baystate applied to the USPTO for registration of its BAYSTATE trademark for health care services, which mark was registered as of October 14, 2003 as U.S. Trademark Registration No. 2,773,059.  *See* Ex. 1 at p. 3.  This mark achieved incontestable status on October 14, 2008.  *See* Ex. 2.  Baystate now has eight active state registrations and eight active federal registrations that incorporate the mark BAYSTATE.  Ex. 1.  As a result of Baystate's efforts, the BAYSTATE mark is now immediately connected in the minds of consumers with health care services specifically provided

by Baystate.[1]  *See, e.g.,* Ex. 15 at p. 150 (article in Springfield newspaper heralding Baystate

Medical Center's ranking as a top hospital in the state, and the nation, while referring to it

simply, in the headline, as "Baystate").

      **B.  Baystate Allowed BSPT To Use the Bay State Physical Therapy Name in Eastern Massachusetts with the Understanding that BSPT Would Not Operate Under that Name in Baystate's Market.**

In 2008, Baystate became aware that BSPT was using the name "Bay State Physical

Therapy" in the Greater Boston area in connection with the provision of physical therapy

services.  Ex. 25.  Baystate contacted defendant Steven Windwer and BSPT to address

Baystate's concerns about potential consumer confusion from BSPT's use of this name.  *Id.*  As a

result of discussions with counsel for BSPT, Baystate understood that BPST was willing to limit

its use of the term BAY STATE to physical therapy clinics located east of the western boundary

of Worcester County. *See* Ex. 26.[2] While the parties discussed a license agreement by which

BSPT would pay Baystate for a license to use the mark in eastern Massachusetts, that agreement

was not consummated. *See id.*  Nevertheless, BSPT did in fact, for eleven years, limit its use of

the BAY STATE mark as discussed. This was sufficient for Baystate, which did not further press

the matter so long as BSPT stayed out of Baystate's core geographic market.[3]

---

[1] Baystate has also heavily invested in the region and is its largest employer.  *See Largest Employers 2019*, BUSINESSWEST *, available at* https://businesswest.com/wp-content/uploads/2019/03/LargestEmployers2019.pdf (last viewed Mar. 27, 2020).  *See also* Ex. 24.

[2] The letters shown in Ex. 26 are not offered for the purpose of establishing Defendants' liability for the claims under this suit, which center on the use of the BAY STATE mark in Western Massachusetts, but instead are offered to show the basis for Baystate to decline litigation and allow BSPT to operate under the BAY STATE mark outside of Baystate's core territory.  *See* Fed. R. Evid. 408(b).

[3]  Unbeknownst to Baystate, BSPT subsequently and fraudulently applied for federal registration of "BAY STATE PHYSICAL THERAPY" and Design, claiming under oath that "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . ." Ex. 3.  Such registration issued on April 12, 2011.

**C. BSPT Has Now Expanded Into the Heart of Baystate's Market By Operating a Facility and Marketing Its Services In Springfield Under the BAY STATE Brand.**

BSPT's marketing strategy changed after March 2019 when Calera Capital, a Boston and San Francisco-based private equity firm, acquired a majority interest in BSPT in partnership with Defendant Windwer through a leveraged buyout transaction. Ex. 31, Ex. 32. That transaction was apparently part of a "platform deal."[4]  Ex. 31; *see* Ex. 32 ("platform business").  At the time of the transaction, BSPT had fifty facilities in Massachusetts, Ex. 31, all of which were east of Worcester.  It apparently was expected, however, that Calera Capital would "aggressively grow the business … with the goal of positioning *Bay State* as a leading outpatient rehabilitation services provider in the greater New England market." Ex. 31. (emphasis added).[5]

Consistent with this game plan, BSPT chose to no longer restrict its use of the BAY STATE mark to Eastern Massachusetts. In November 2019, BSPT opened a facility in Baystate's backyard under the mark BAY STATE PHYSICAL THERAPY (hereinafter "BSPT-Springfield").  *See* Ex. 35.  The facility is located fewer than ten miles from Baystate's flagship hospital, as well as BAYSTATE-branded facilities in Agawam, Longmeadow, and Springfield that offer such services.  Maloney Aff. ¶ 4, *see* Ex. 36.  As shown by the following copy of a map that Defendants, as of the date of this Memorandum, provide on BSPT's website

---

[4]  A "platform deal" is one in which a company expands into a new market by acquiring an existing business with an already sizeable base of operations which then becomes the platform from which to launch further expansion. *See What is a Platform Acquisition*, DIVESTOPIA, available at https://www.divestopedia.com/what-is-platform-acquisition/2/8168 (last viewed Mar. 27, 2020).

[5]  The transaction was followed by a period of rapid corporate reorganization, including Bay State Physical Therapy of Randolph's conversion from a professional corporation to a domestic profit corporation, the addition of a senior managing director and a managing director of Calera Capital to BSPT's Board, and the formation of Bay State Physical Therapy, P.C. *See, e.g.,* Exs. 33, 34.  BSPT also acquired or otherwise assumed control of the operations of nine additional facilities after March 2019. *See* Ex. 35.

to show the location of BSPT's facilities, Ex. 28, BSPT-Springfield is the only physical therapy clinic or facility located west of Worcester County that BSPT owns and operates:



Upon learning of the new facility using the BAYSTATE mark in Baystate's backyard, Baystate contacted BSPT to demand that it stop using Baystate's brand to identify its Springfield clinic, citing the inevitable consumer confusion that would otherwise result.  Ex. 27.  BSPT, however, has refused to stop using Baystate's mark and, to date, continues to operate its physical therapy facility in Springfield under the BAY STATE trademark.  *See, e.g.*, Ex. 9.

It is not apparent how a prospective consumer viewing the parties' respective marketing materials could possibly distinguish one "Baystate" physical therapy provider from the other, or how a consumer could understand that Defendants' Springfield services, and the quality thereof, are not under the control and direction of Baystate.  Defendants refer to BSPT merely as "Bay State" or "Baystate" in their advertising.  *See, e.g.,* Exs. 4 and 5.  Consumer reviews currently available on BSPT–Springfield's website show that consumers interchangeably refer to Defendants' facility as "Bay State" or "Baystate."  *See* Ex. 9 at 1, 4.  Similarly, a Google search for "Bay State Physical Therapy" brings up BSPT's website as an initial result and Baystate's as

a second, whereas a search for "Baystate Physical Therapy" opens with two results from BSPT's website, followed by three results from Baystate's website. *See* Exs. 7 and 8. No prospective consumer referring to these search results could possibly distinguish one "Baystate" physical therapy provider from the other.

Actual consumer confusion has begun. The Principal of Springfield Central High School, Tad Tokarz, contacted the program manager of Baystate's rehabilitation services to ask him whether Baystate had opened a new location in Springfield at what is the BSPT-Springfield location. Maloney Aff. ¶¶ 5-6, Ex. B. "I am confused. Is this your company?" he asked. *Id.* Mr. Tokarz wanted to recommend the services to a friend but was not certain if the services provided under the Bay State mark were provided by the Baystate with which he was familiar. *Id.* Similarly, a physical therapist assistant working in one of Baystate's five rehabilitation care offices has received multiple inquiries about the "new" Springfield Baystate location. Harrington Aff. ¶ 5, Ex. A. She wrote "to let management know about this place of business and to clarify any confusion about it being in our health system**."** *Id.*

### III.   ARGUMENT

Baystate is entitled to a preliminary injunction if it shows: 1) a likelihood of success on the merits; 2) a likelihood of irreparable harm if the injunction is not issued; 3) that the balance of equities favors an injunction; and 4) that the public's interest will not be adversely affected by the granting of the injunction. *See, e.g., Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 83 (D. Mass. 2008). The "*sine qua non* of this four-part inquiry is likelihood of success on the merits." *New Comm. Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). This is particularly true when the movant seeks a preliminary injunction based on a trademark claim, since irreparable harm generally follows from infringement. *See Borinquen*

*Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 115 (1st Cir. 2006). Under this test, as discussed below, Baystate is entitled to a preliminary injunction enjoining BSPT's use of the BAYSTATE mark in the heart of Baystate's market.

    **A.  Baystate is Likely to Succeed on the Merits.**

    A trademark or service mark includes any word, name, symbol, or device…used by a person…to identify and distinguish his or her goods [or services] . . . from those manufactured or sold by others and to indicate the source of the goods [or services]." 15 U.S.C. § 1127.  Most fundamentally, a trademark serves to prevent confusion as to the source of goods or services identified by the mark.  *See I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 35 (1st Cir. 1998) (noting that "[a] primary purpose of . . . trademark protection is to protect that which identifies a product's source"). To this end, Baystate will prevail on its claim of trademark infringement[6] if it shows that: 1) its BAYSTATE mark is valid; and 2) BSPT's use of BAY STATE, whether or not joined to the generic term Physical Therapy, is likely to cause consumer confusion.  *Star Fin,. Servs., Inc. v. AASTAR Mort. Corp.*, 89 F.3d 5, 8 (1st Cir. 1996); *see also Boston Beer Co., LP v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 180 (1st Cir. 1993) ("Once the determination has been made that a term is entitled to trademark protection, the pivotal inquiry becomes whether the allegedly infringing mark is likely to cause consumer confusion.").

    **1.  Baystate's BAYSTATE mark is valid under both federal and state law.**

    Baystate long ago established the validity of the BAYSTATE mark under both federal and state law. Pursuant to federal law, Baystate registered the mark with the USPTO as U.S. Trademark Reg. No. 2,773,059 in October of 2003. This alone is "prima facie evidence of the

---

[6] Baystate does not herein discuss, but does not waive, its related arguments that BSPT's trademark registration is invalid as being obtained through fraud on the USPTO and that BSPT's conduct constitutes unfair competition and false designation of origin.

validity of the registered mark" and entitles Baystate to the presumption that the mark is distinctive. *See* 15 U.S.C. § 1115(a); *Borinquen Biscuit Corp*., 443 F.3d at 115. That presumption became conclusive when the registered mark achieved incontestable status on October 14, 2008. *See* 15 U.S.C. § 1065; Ex. 2 (Declaration of Incontestability).

Baystate has also separately established the validity of its BAYSTATE mark under state common law by its continuous use of the mark on health care services in its "trade area" since 1976. Common law rights to a trademark are distinct from, but consistent with, the trademark rights codified in the Lanham Act or protected by registration. *See Dorpan v. Hotel Meliá, Inc.*, 728 F.3d 55, 62 (1st Cir. 2013). Before passage of the Lanham Act in 1946, state common law provided the principal framework for the establishment and protection of trademarks. *See id.* While the Lanham Act created a federal statutory framework to protect trademarks throughout the United States, *see* 15 U.S.C. §§ 1501-1129, it did not supplant the state common law of trademarks. *Dorpan*, 728 F.3d at 62. Any federal registration of a mark provides the exclusive of that mark only insofar as those rights do not conflict with pre-existing rights acquired under state law. *Id.*; *see* 15 U.S.C. § 1065. "The Lanham Act was designed to codify, not change, the common law in this area." *See Dorpan* 728 F.3d at 62 (citing *In re Spirits Int'l, N.V.*, 563 F.3d 1347, 1354 (Fed. Cir. 2009)).

Thus, trademark users still may gain rights to a trademark under the common law. *See Dorpan*, 728 F.3d at 62. Under both the common law and the Lanham Act, a senior user of a mark in a defined area has superior rights to a junior user, registered or not, in the same trade area. *See Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc*., 831 F.2d 1177, 1180 (1st Cir. 1987); *see also Dorpan*, 728 F.3d at 62; 15 U.S.C. § 1065. The scope of common law rights in a mark are determined by its "trade area"; that is, the area in which the mark is "in use." *See Dorpan*,

728 F.3d at 63.  A mark's trade area can be assessed by review of the sales, reputation, and advertisements of the products or services identified by the mark in a region.  *See* 2 McCarthy, *Trademarks and Unfair Competition* § 26:18 at 327 (2d ed. 1984)).

The BAYSTATE trade area is Western New England, where the mark has developed incalculable goodwill.[7]  *See, e.g.,* Ex. 17. Since 1976, Baystate has extensively and continuously advertised and offered for sale its services throughout this area under the BAYSTATE mark. *See, e.g.*, Ex. 14 (2016 Baystate Branding Guidelines).[8]  This has included extensive signage, billboards, print advertising, electronic advertising, and promotional items bearing its BAYSTATE mark.  *See, e.g.*, Exs. 11, 12 (billboards); Ex. 13 (promotional items)).  As a result, in 2018 alone, Baystate had a net revenue of more than $1.4 billion from patient services offered under the BAYSTATE name.  Ex. 10 at p. 4, c. 1, top line.  The BAYSTATE mark is distinctive and regionally famous in Western New England, which is perhaps epitomized by the frequent reference of consumers and the regional press to the collection of Baystate Health, Inc. services and facilities simply as "Baystate." *See* Ex. 15 (collection of articles from local/regional press where Baystate is referred to as "Baystate").  It cannot be disputed that BAYSTATE is a valid—and very strong—mark in the Western New England region, including Western Massachusetts.

Because Baystate established common law rights  in the mark BAYSTATE in Western New England decades ago, and because any rights BSPT obtained to its 2011 registration of its

---

[7]  Specifically, this trade area includes at least the regions of Massachusetts west of the western boundary of Worcester County, Southern Vermont, and the upper half of Litchfield, Hartford, and Tolland counties in Connecticut.  Baystate seeks in its Complaint and will continue to seek throughout these proceedings a permanent injunction that protects at least its entire trade area.  This motion for preliminary injunction, however, is focused on the immediate, irreparable harm and consumer confusion caused by BSPT's sudden incursion into the epicenter of Baystate's trade area.

[8]  In contrast, BSPT, whose alleged first use of its mark postdates Baystate's use of BAYSTATE by nearly twenty years, first entered this market in November 2019.

confusingly similar mark are inferior to, and were taken subject to, those common law rights, BSPT must refrain from using its BAY STATE mark in Baystate's trade area. *See Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc*., 831 F.2d 1177, 1180 (1st Cir. 1987).

> **2.  BSPT's use of BAY STATE, whether or not joined to the generic term "Physical Therapy," is likely to cause consumer confusion.**

Perhaps the most fundamental purpose of trademark law is to prevent consumer confusion about who provides services or goods designated by a trademark. *See Star Fin. Servs., Inc. v. AASTAR Mort. Corp.*, 89 F.3d 5, 8 (1st Cir. 1996). Consumer confusion is not only bad for the public, but it likely will "jeopardize the commercial reputation of the senior (first) user, which might be tarnished by association with the junior (subsequent) user." *See Dialogo, LLC v. Santiago Bauza*, 467 F. Supp. 2d 115, 126 (D. Mass. 2006).

Courts may consider at least the following factors in assessing the likelihood of consumer confusion between two marks:  (1) the similarity of the marks; (2) the similarity of the goods or services branded by the marks; (3) the relationship between the parties' channels of trade, advertising, and classes of prospective purchasers; (4) evidence of actual confusion; (5) the defendant's intent in adopting its mark; and (6) the strength of the plaintiff's mark. *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 120 (1st Cir. 2006). No singular factor is determinative; rather, all facts must be evaluated in context and in light of the circumstances in which the ordinary consumer will confront the conflicting mark. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987). As discussed below, application of these factors to the facts of this matter necessarily leads to the conclusion that consumer confusion is not only likely, but inevitable, if BSPT were to continue to use the BAY

STATE mark in association with its physical therapy services in Western Massachusetts  In fact, confusion has already occurred.

### (1) The Marks Are Visually Similar and Phonetically Identical.

The degree of similarity between marks is determined by analyzing their sight, sound, and meaning.  *See Commerce Bank & Tr. Co. v. TD Banknorth, Inc.,* 554 F. Supp. 2d 77, 86 (D. Mass. 2008).  This assessment is made on the basis of "the total effect of the designation.…" *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

The marks at issue in this matter are essentially identical, as the addition of a descriptive or generic term, such as the phrase "Physical Therapy," to a trademark does nothing to eliminate the similarity between the marks or the likelihood of confusion between the two.  *See, e.g., Polar Corp. v. PepsiCo., Inc.*, 789 F. Supp. 2d 219, 230 (D. Mass. 2011); *see also* TMEP § 1207.01(b)(iii). Thus, the *only* difference between the marks at issue in this matter is that Baystate's BAYSTATE mark is one word, whereas Defendants present the mark as two words.

This is a distinction without a difference. BAY STATE and BAYSTATE are virtually indistinguishable when seen, and completely indistinguishable when heard. Where there is such phonetic equivalency, confusion between two marks is virtually certain when they are used to designate similar services to the same group of consumers. *See, e.g., Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 836 (C.D. Cal. 2018) (finding a likelihood of confusion when defendant's "Synaptek" trademark and plaintiff's "Synoptek" trademark were "essentially phonetic equivalents"); *Veve v. Corporan*, 977 F. Supp. 2d 93, 102 (D.P.R. 2013) (finding likelihood of confusion when defendant's mark "Atabey" that bore a "great phonetic likeness" to the already existent "Batey" mark was used to market almost identical services). Here, there is

no question that the marks BAYSTATE and BAY STATE are phonetically identical and virtually certain to lead to confusion when used to designate similar services.

> **(2)  The Services That BSPT Provides Under the BAY STATE Mark are Nothing More Than a Subset of the Services that Baystate has Long Provided under the BAYSTATE Mark.**

Baystate provides health care services, including rehabilitative and physical therapy services, under its BAYSTATE mark.  Maloney Aff. ¶ 3.  BSPT declares in its name that it is providing physical therapy services under the BAY STATE mark.  Its own marketing materials indicate that BSPT provides no significant services under the BAY STATE mark that Baystate does not provide under the BAYSTATE mark.  *See* Maloney Aff. ¶ 3, Ex. A.

> **(3)  Baystate and BSPT's Channels of Trade, Advertisements, and Classes of Prospective Purchasers are Similar.**

When considering likelihood of confusion, the relationship between the parties' channels of trade, the relationship between their modes of advertising, and the classes of consumers of their services are typically considered together. *See Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 19 (1st Cir. 2004).  In this case:

- Baystate provides services to, or through, individuals, physicians, physicians groups, health care organizations, and the like. *See* Smith Aff. ¶ 4; Maloney Aff. ¶ 8.  BSPT, likewise, appears to provide services to individuals, who may be referred to its office by physicians, physicians' groups, or other health care organizations. *See* Ex. 9 at 4 (referrals).

- The individuals and groups to whom Baystate markets its physical therapy services reside mostly in Western New England, including Western Massachusetts. Smith Aff. ¶ 5.  The very problem before the Court is that BSPT is

marketing a facility and its services in the identical market of Western
Massachusetts.

- Baystate advertises online, through social media, on billboards, and in the local
  press.  Smith Aff. ¶ 3.  BSPT markets its Springfield services on its website, Ex.
  9, and has a social media presence, including an Instagram account, Ex. 30, and a
  Facebook Page dedicated to the Springfield location, Ex. 29.  BSPT also promotes
  itself through republication of public relation pieces in the press.  *See* Ex. 16
  (article from Press Release PR Newswire).

Most importantly, with its new facility in Springfield, BSPT is targeting precisely the
same class of purchasers of physical therapy services as Baystate.

### (4)  Consumers Are, In Fact, Already Experiencing Confusion.

While a plaintiff is not required to show evidence of actual confusion to prevail on a
claim for trademark infringement, *see Calamari Fisheries, Inc. v. Village Catch, Inc.,* 698 F.
Supp. 994, 1006 (D. Mass. 1988), evidence of actual confusion is clear evidence of likely
confusion.  *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 120 (1st Cir.
2006).  "Actual confusion is such persuasive evidence of the likelihood of confusion that even a
minimal demonstration of actual confusion may be significant."  *Boustany v. Bos. Dental Grp.,
Inc.*, 42 F. Supp. 2d 100, 110 (D. Mass. 1999) (internal quotations omitted) (issuing preliminary
injunction after plaintiff made at least "minimal showing" of actual confusion).

Defendants just opened their Western Massachusetts facility this past November and, as
summarized above, there already is such evidence. For example, on BSPT's own website, there
is a review by one of BSPT's patients who states that she "came to *Baystate*" with a neck injury.
*See* Ex. 9 at p. 1. One Baystate Physical Therapy Assistant alerted her superiors to the new

"BAY STATE" facility and to the fact that she had been asked whether the facility "is affiliated with our office." Harrington Aff.  The Principal of Springfield Central High School wrote to the Director of Baystate Rehabilitative Care, stating that he had gone to "Best Fitness" where BSPT's Springfield facility is located and "noticed that Bay State is now occupying their rehabilitation space."  Maloney Aff. ¶ 5, Ex. B.  This consumer then continued, "*I am confused. Is this your company? I was going to recommend a friend to the service but wanted to make sure it was the BayState rehabilitation of which I am familiar.*" *Id.*

It is clear that BSPT's use of the BAY STATE mark to designate physical therapy services in Western Massachusetts is already causing actual consumer confusion. Given that "even a minimal demonstration of actual confusion" is significant and operates as "the most persuasive possible evidence that there is a likelihood of confusion," this factor heavily favors entry of a preliminary injunction.  *Boustany*, 42 F. Supp. 2d at 110 (quoting *Copy Cop Inc. v. Task Printing, Inc.,* 908 F. Supp. 37, 45 (D. Mass. 1995)).

### (5) BSPT Acted in Bad Faith When It Adopted A Confusingly Similar Mark to Baystate's to Designate Its Services in Springfield, Massachusetts.

Since at least 2008, BSPT has been aware that Baystate has been operating under the BAYSTATE mark in Western Massachusetts. Ex. 25.  Even before then, BSPT had at least constructive notice of Baystate's use of the mark from the records of Baystate's trademark registrations with the USPTO and the Commonwealth of Massachusetts. Ex. 1.  BSPT certainly knew when it opened its facility in Springfield and branded it BAY STATE that it was doing so in the heart of Baystate's market and the geographical focus of its BAYSTATE trade area.

Not only did BSPT move into Baystate's region, it set up its BAY STATE shop in Springfield, Massachusetts, fewer than 10 miles from Baystate's flagship BAYSTATE hospital

and at least three other Baystate rehabilitation facilities.  *See* Ex. 36.  It would be incredulous for Defendants to now argue that their decision to use the BAY STATE mark in Baystate's backyard was not done without awareness of and intent to exploit the strength, positive reputation and regional fame of the BAYSTATE mark, as well as the knowledge that consumer confusion as to the source of those services would be likely.  BSPT has no plausible grounds to argue that its infringement of Baystate's mark was innocent or conducted in good faith.[9]

### (6) Baystate's Mark is Strong.

Baystate has owned and continuously used the BAYSTATE mark in interstate commerce for more than forty years.  The trademark is federally registered and has attained incontestable status.  *See* 15 U.S.C. § 1115(a); *Borinquen Biscuit Corp.*, 443 F.3d at 120.  The BAYSTATE mark has demonstrable commercial strength, as evidenced by its renown in the health care industry, its long history of use in the Greater Springfield area, and Baystate's consistent and concerted efforts to promote the mark.  *See Bos. Duck Tours*, *L.P. v.  Super Duck Tours, LLC,* 531 F.3d 1, 16 n. 14 (1st Cir. 2008) (commercial strength denotes the mark's consumer recognition value in the marketplace).  Baystate is the premier healthcare organization in the Greater Springfield area, the largest employer in Western Massachusetts, and one of the top three hospitals in the state.  Ex. 15 at p. 150.  Its efforts to promote the mark have been so successful that individuals, physicians, physicians' groups, and other officers—as well as local press reporting on Baystate's state- and nation-wide recognition as a purveyor of superior health care services—consistently refer to Plaintiff and its facilities simply as BAYSTATE.  *See, e.g.,* Ex.

---

[9]   BSPT's course of conduct, in previously stating its willingness to refrain from using the BAY STATE mark in association with any physical therapy clinic west of the western boundary of Worcester County, and then suddenly exploiting that mark in Western Massachusetts, is further evidence of its bad faith attempt to leverage off of Baystate's most important trademark.

15.  It cannot be credibly contested that BAYSTATE is a very strong mark throughout Western New England as designating a specific source of medical-related services.

**B.  Baystate is Suffering Irreparable Harm.**[10]

"By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill and reputation cannot be satisfactorily quantified." *Pefrumania, Inc. v. Perfulandia, Inc.*, 279 F. Supp. 2d 86, 103-04 (D.P.R. 2003).  Baystate has worked diligently over the years to develop and maintain a sterling reputation and consistent brand identity.  Ex. 14.  Now, because of BSPT's actions, it is associated with an institution whose advertisements mirror those expected from ambulance chasing lawyers rather than from an intelligent, compassionate, professional caregiver.  Compare Ex. 18 at 5 ("Have you been injured in an automobile accident?") with Ex. 14 at 4 (Baystate guidelines for brand's voice). The loss of reputation and goodwill to the brand that will result from BSPT-Springfield's level of advertising, the overall physical appearance and location of its facility, and the loss of control over services provided under its (perceived) brand cannot be quantified and made whole by payment of damages alone.  Such harm to Baystate will clearly be irreparable. *See, e.g., Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 192, 205 (3d Cir. 2014).

**C.  The Balance of Hardships Weighs in Favor of Baystate**

As shown above, should the Court fail to enjoin BSPT's use of the BAY STATE mark, Baystate will continue to suffer irreparable harm in its core market.  The forty-plus years of

---

[10]  Historically, there has been a presumption that a plaintiff who has established a likelihood of success on the merits of a trademark infringement claim will be irreparably injured.  *See, e.g., Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 87 (D. Mass. 2008).  While this Circuit has questioned this presumption in recent years, *see, e.g., Voice of the Arab World, Inc. v. MDTV News Now, Inc.*, 645 F.3d 26, 32-34 (1st Cir. 2011), Baystate does not need to rely upon it, because it can point to immediate, unquantifiable harms caused by BSPT's use of the BAY STATE mark in the heart of Baystate's territory.

goodwill and associations between its BAYSTATE mark and its services, and the millions of dollars it has invested in the mark, have been and will continue to be eroded by BSPT's provision of similar services under a confusingly similar mark. Baystate's likely harm is irreparable, substantial, and impossible to quantify.

In a case such as this where infringement appears likely, "the court proceeds from the proposition that '[]harm to the defendant flowing from an injunction … is entitled to less consideration than other harms." *Boustany*, 42 F. Supp. 2d at 111–12 (quoting *Robert J. Fritz, DMA, Inc. v. Arthur D. Little, Inc.,* 944 F. Supp. 95, 97–98 (D. Mass. 1996)). Furthermore, there is comparatively little likely harm to BSPT from an injunction for the Court to consider. BSPT only recently moved into the Springfield market.  Other than an exterior sign, which makes no specific reference to Springfield and which could be repurposed for a BSPT facility in Greater Boston, Ex. 22, BSPT does not appear to have made any capital investments in the brand in this region.  Further, given the flexibility of the English language, there is no shortage of names BSPT could use to identify its facility which would not infringe the BAYSTATE mark, including "Milton Chiropractic", which Mr. Windwer has been using since 1992, or Aligned Health Partners, Cypress Health Partners, or Fulcrum Health Partners, all of which are trademarks BSPT has indicated its intent to use in recent filings with the USPTO.  *See* Ex. 23 (referenced filings).

Moreover, BSPT was well aware of Baystate's rights to the BAYSTATE mark well before it opened its facility in Springfield and commenced its use of the BAY STATE brand in Baystate's backyard.  Thus, any harm to BSPT from the requested injunction is a direct result of BSPT's conscious decision to ignore Baystate's trademark rights and exploit its BAYSTATE brand.

### D.  An Injunction Will Serve the Public Interest

Preventing consumer confusion and allowing protection of trademarks is generally in the public's interest.  *See Borniquen Biscuit Corp.,* 443 F.3d at 115 ("As a matter of public policy, trademarks should be protected against infringing use.").  In trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions." *Boustany v. Bos. Dental Grp., Inc.*, 42 F. Supp. 2d 100, 113 (D. Mass. 1999) (citing *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir. 1988)).  Consumers should not be deceived or confused about the service they are provided, particularly in a situation where the services affect mobility and health. Considerations of the interests of the public weigh heavily in favor of granting the injunction.

### IV.    CONCLUSION

For the reasons stated above, Plaintiff Baystate Health, Inc. respectfully requests that its motion be granted and that Defendants be immediately enjoined from using in commerce the BAY STATE mark or any variant thereof, including but not limited to on the internet and in its domain name and email address and whether or not associated with the term "physical therapy" or "pt," to market, advertise, promote, or otherwise refer to any facility located or services provided in Springfield, Massachusetts or any other location in the Commonwealth of Massachusetts that is west of the western border of Worcester County, Massachusetts.

RESPECTFULLY SUBMITTED

PLAINTIFF,
BAYSTATE HEALTH, INC.
By Its Attorneys,

*/s/ Mary Bonzagni*
Mary R. Bonzagni, Esq. (BBO # 553771)
James C. Duda, Esq. (BBO # 551207)
Lauren C. Ostberg, Esq. (BBO # 696883)
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Dated: April 2, 2020        Springfield, MA 01115-5507
Tel. (413) 272-6286
mbonzagni@bulkley.com
jduda@bulkley.com
lostberg@bulkley.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system on April 2, 2020, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants on the date of its filing.

*/s/  Lauren C. Ostberg*
Lauren C. Ostberg

3241213v3