```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2                   WESTERN SECTION

 3

 4
     Baystate Health, Inc.            )
 5                                    )          20cv30042-MGM
          vs                         )
 6                                    )          May 15, 2020
     Bay State Physical Therapy, P.C. )
 7   _____)

 8

 9                 Telephone Hearing Held Before

10               The Honorable Mark G. Mastroianni

11                  United States District Judge.

12

13   APPEARANCES:

14   On behalf of the plaintiff:  James C. Duda, Bulkley,
     Richardson & Gelinas, 1500 Main Street, Suite 2700,
15   PO Box 15507, Springfield, MA 01115-5507.

16   Lauren C. Ostberg, Bulkley, Richardson & Gellinas, 1500
     Main Street, Suite 2700, PO Box 15507, Springfield, MA
17   01115-5507.

18   Mary R. Bonzagni, Bulkley, Richardson & Gelinas, 1500 Main
     Street, Suite 2700, PO Box 15507, Springfield, MA
19   01115-5507.

20   On behalf of the defendant:Lucy Jewett Wheatley,
     McGuireWoods LLP, 800 East Canal Street, Richmond, VA
21   23219.

22                    Alice Moran, CSR, RPR, RMR
                      Official Federal Court Reporter
23                     United States Courthouse
                       300 State Street, Room 303D
24                       Springfield, MA 01105
                         alice.moran@verizon.net
25
```

1    **(Telephone Hearing commenced at 9:31.)**

2              THE CLERK:  The case we're hearing via telephone

3    this morning is Civil Matter 20-30042, Baystate Health,

4    Inc. versus Bay State Physical Therapy, PC, et al.

5         Counsel, I'm going to ask you to identify yourself

6    for the record please.

7              MR. DUDA:  This is James Duda of Bulkley,

8    Richardson on behalf of plaintiff Baystate Health.

9              MS. WHEATLEY:  And this is Lucy --

10             MS. BONZAGNI:  Mary --

11             MS. OSTBERG:  Lauren Ostberg is also here for

12   Baystate Health.

13             MS. BONZAGNI:  Mary Bonzagni also here on behalf

14   of Baystate Health.

15             MS. WHEATLEY:  This is Lucy Wheatley from

16   McGuireWoods representing the defendants Bay State

17   Physical Therapy, Bay State Physical Therapy of Randolph,

18   and Steven Windwer.

19             THE COURT:  Okay.  We survived the introductions

20   so let's go forward with this.

21        I'm familiar with the paperwork.  Baystate Health,

22   why don't you walk me through your argument in support of

23   your request for an injunction and perhaps during your

24   argument I might stop you and ask you to clarify certain

25   points.

1          Go right ahead, Attorney Duda.

2              MR. DUDA:  Thank you, Your Honor, and thank you

3      for hearing us today during these times.

4          Plaintiff Baystate Health, Inc. has a stable of

5      Baystate trademarks that are registered federally in

6      Massachusetts.  It can claim protection for those marks

7      throughout Massachusetts and throughout the United States.

8      Those broader rights however are not at issue today.

9          Baystate is here today seeking very limited relief.

10     It is seeking only to have its rights to the Baystate

11     trademark under the common law be enforced immediately

12     only in its direct trade area.

13         It does not seek to prevent the defendants from

14     continuing to use Bay State Physical Therapy mark in

15     connection with its approximately 40 other facilities in

16     eastern Mass. and New Hampshire.

17         In effect, what Baystate is asking the court is to

18     prevent the use of that mark in a single facility in

19     Baystate's own back yard and a facility that opened only

20     recently.

21         In light of the scope and the basis of relief that

22     Baystate is seeking, the case law that is applicable to

23     this matter and squarely on point is provided by --

24             THE COURT:  Tell me where are the -- the other

25     Bay State Physical Therapies are all located around the

1    Boston area?

2            MR. DUDA:  Yes, they're all Worcester east.

3            THE COURT:  They've been operating there for

4    some time?

5            MR. DUDA:  Yes, Your Honor.

6            THE COURT:  And what's been Baystate Health

7    Systems reach out into that area?  Baystate Health Systems

8    isn't just located in the Springfield area?

9            MR. DUDA:  Towards Worcester.

10           THE COURT:  Tell me about that.

11           MR. DUDA:  Yes, Your Honor.  Baystate has

12   facilities throughout western Massachusetts.  It's up in

13   Franklin County, Hampshire County, Hampden County and I

14   think as far as Ware, but they do not have any medical

15   facilities, provide medical care east of the western

16   border of Worcester County.

17           THE COURT:  Okay.  So there's nothing in

18   Worcester.  It stops right at Worcester?

19           MR. DUDA:  Yes, Your Honor.

20           THE COURT:  All right.  I thought that you might

21   have had some other types of -- some presence out in the

22   Worcester area, not Boston but getting into Worcester.

23   Okay.  Thank you for clarifying.

24           MR. DUDA:  Just to clarify to make sure that I

25   don't misspeak, there are a number of what are called

1    reference laboratories that Baystate has out in the

2    eastern part of the state, but those are just

3    laboratories.  They don't have any medical facilities that

4    provide medical care in that direction.

5            THE COURT:  But they're clearly offshoots of

6    Baystate Health?

7            MR. DUDA:  They are owned by Baystate; they are

8    reference laboratories.

9            THE COURT:  Okay.  And Baystate Reference Labs

10   include going into Boston?

11           MR. DUDA:  I believe so, yes, or at least around

12   the Boston area.

13           THE COURT:  Okay.  Thank you.

14           MR. DUDA:  As I was saying, in the light of the

15   scope and the basis of relief that Baystate is seeking,

16   the case law that is applicable to the matter and we

17   believe is squarely on point is provided by two cases from

18   the First Circuit.  One is *Thrifty Rent-A-Car System v.*

19   *Thrift Cars* and that's at 831 F.2d 1177, a citation from

20   1987.  And then subsequently there's the *Dorpan v. Hotel*

21   *Melia* case, 728 F.3d 55, and that case is from 2013.

22       It's clear under those opinions that a senior user of

23   a mark in a defined area, a defined trade area has

24   superior rights to a junior user, registered or not, in

25   that same trade area.  Both of those cases squarely hold

1     that.

2          The district court cases by which defendants rely,

3     both named *Baystate Savings Bank v. Baystate Financial*

4     *Services*, one from 2004 and one from 2007, did not and

5     could not alter the law established by *Thrifty Rent-A-Car*

6     in 1987 and then reaffirmed by *Dorpan* in 2013.

7          Under that law explained by *Thrifty Rent-A-Car* and

8     *Dorpan*, defendants had no right to use the Baystate name

9     in western Massachusetts to a registered Bay State

10    Physical Therapy design mark in April 2011.

11         It cannot be contested by that date that Baystate had

12    firmly established its Baystate mark in this trade area

13    for healthcare services including physical therapy.

14         In connection with that, I would point the court to

15    in particular Exhibit 38 which is an article about Wally

16    Garstka who received cardiac rehabilitation -- which I

17    don't think the defendants are going to claim does not

18    involve physical therapy -- after each of his medical

19    procedures at Baystate going back to 1994 and at page 30

20    of Exhibit 1 showing a 1999 state trademark registration

21    establishing that by 1996 Baystate had been using the

22    Baystate Rehabilitation care mark for "physical therapy"

23    among other things.

24         While this case is controlled by *Thrifty Rent-A-Car*

25    and *Dorpan*, it is not about cars and hotels.  This case is

1    about medical care and it comes in lieu of a pandemic.

2         This case is about being sure that a patient does not

3    go into a for-profit treatment facility undergoing rapid

4    corporate expansion with the belief that he or she is

5    entering a care facility under the control of a trusted,

6    well-respected, nonprofit medical organization with strict

7    oversight procedures to protect the patient's health.

8         This is not where a mistake and you should get a bad

9    car; this is where a mistake now can literally mean the

10   difference between life and death.

11        Bay State Physical Therapy is a for-profit

12   corporation that has continued to operate throughout the

13   pandemic.  Baystate Health has no control over the

14   procedures that Bay State Therapy is using to protect its

15   patients.  It has no control on the nonessential

16   procedures; it has no control on any contact; it has no

17   control over how Bay State Physical Therapy treats its

18   patients.

19        If as a result of Bay State Physical Therapy's

20   procedures a patient who -- if his or her treatment was

21   subject to the oversight of Bay State becomes sick and

22   dies, that would be truly irreparable harm.  The harm to

23   the patient is obvious.  The harm to Baystate when the

24   Springfield Republican headline reads Patient contracts

25   COVID-19 at Bay State Physical Therapy will also be truly

1    irreparable.

2         I use the COVID-19 example because its repercussions

3    are clear.  The same holds true for any procedure at Bay

4    State Physical Therapy.  The risk both to confuse patients

5    to Baystate in connection with any such procedure are

6    clear.  Trademark infringement damages are unlike other

7    harms.

8              THE COURT:  What are you telling me about the

9    liklehood of confusion?  You're basing that simply on the

10   name, the Bay State -- that Bay State name only?  Is there

11   anything about the design of their website or their emblem

12   or the logo or their business model, a sign in their

13   windows, anything else that makes it look like there could

14   be confusion?

15             MR. DUDA:  Well, Your Honor, I think we

16   mentioned somewhat in our briefing if you go to their

17   website, you will see occasions where a patient is quoted

18   as saying -- as referring to Bay State Physical Therapy I

19   think as Baystate.

20        I've noticed -- it's not in our papers because I just

21   found it.  There's a March 20, 2020 Bay State Physical

22   Therapy COVID-19 update that's on its website.  This March

23   20, 2020 document twice uses the term Bay State without

24   anything else.  "Bay State is transitioning lower acuity

25   and routine visits.  Safety of our patients and team

1   members is paramount to Bay State," and we also believe

2   that we (inaudible).

3       So it's not an issue of design.  The fact is using

4   the term Bay State either alone --

5               THE COURT:  Christina, are you still there?

6               MR. DUDA:  Yes, I'm still here.

7               THE CLERK:  I am.  Judge?

8               THE COURT:  Yeah, hello.  I lost you guys for a

9   minute.

10              MR. DUDA:  I'm sorry.

11              THE CLERK:  Okay.

12              THE COURT:  Christina, could everyone still hear

13  the attorney talking?

14              THE CLERK:  Yeah.  Everyone can hear.

15              THE COURT:  All right.  I lost him for a good

16  10, 15 seconds.

17              MR. DUDA:  I'm sorry.  I think I had -- the

18  question, as I understood it, was there other -- did I

19  have other examples for discussion about how the term was

20  being used, and as I indicated that on the website you can

21  see references to Bay State used certainly outside of the

22  design mark.  Sometimes used just as a word alone Bay

23  State as two words or Baystate as one word.

24      In one particular example which I indicated that can

25  be found on their website right now at Baystatept.com it's

1    an announcement press release from March 20, 2020.  It's

2    Bay State Physical Therapy COVID-19 update, and twice in

3    this document on the first page it refers simply to Bay

4    State.  "Bay State is transitioning lower acuity and

5    routine visits."

6        In the next paragraph, "The safety of our patients

7    and team members is paramount to Bay State," without even

8    the use of the tag line physical therapy and certainly

9    outside of the design mark.

10        We would say in any event that the addition of the

11    tag mark means very little since it's simply a generic

12    term and adds little to the use of the mark.

13        I've not gone through the various elements that we

14    had outlined in our brief as to showing likelihood of

15    confusion, but if the court would like we could.

16            THE COURT:  Tell me -- we don't need to go

17    through all of them, but Bay State Physical Therapy, is it

18    one word or two words as compared to Baystate Health?

19            MR. DUDA:  The Bay State for physical therapy is

20    two words and Baystate, our Baystate is one word.  But for

21    purposes of what we're talking about, which is the

22    Baystate mark, it's just that's really the only difference

23    particularly when it's used as Bay State.  And I think

24    it's clear from precedent and from the USPTO itself that

25    marks are judged by the way that they sound, the audio

1    impression of it that's the key.

2         THE COURT:  Now what importance, if any, does

3    the negotiation -- or I shouldn't say negotiation, the

4    discussions between Baystate Health and Bay State Physical

5    Therapy going back to 2008?  What, if any, import does

6    that have on now when Bay State Physical Therapy comes to

7    Springfield in 2019?

8         MR. DUDA:  I think it has little significance

9    with what we're talking about right now, Your Honor, which

10   is the preliminary injunction.

11       I mean, there was an attempt -- I think for this

12   motion it's a bit of a side issue, but there was an

13   attempt to resolve this matter back in 2008 I guess and

14   discussions were had.

15       As indicated in our brief, it appeared that an

16   agreement was made that Bay State Physical Therapy would

17   stay east of the western boundary of Worcester and would

18   pay a fee.  That agreement was never executed.  The

19   parties did not agree in writing that that was going to

20   happen and the parties ended negotiations.  But for the

21   next eleven years Bay State Physical Therapy stayed on the

22   other side.

23       Baystate Medical, Baystate Health is not a

24   particularly litigious organization.  It's a nonprofit

25   organization and is not looking for a fight, and it was

1    willing to allow Bay State Physical Therapy to simply
2    continue in eastern Mass. without paying anything.  But
3    the big change is when it leaped to Springfield and just a
4    few miles down the road from the flagship hospital and
5    facility, other facilities by Baystate that provides
6    physical therapy, it opened up Bay State Physical Therapy.
7    It's just a different ball game then because it came right
8    into Baystate's back yard.  This is its trade area.  This
9    is where --
10          THE COURT:  So you had acquiesced -- the
11   negotiations fell apart and they weren't perused after
12   2008 or '9 and so you had acquiesced to them continuing to
13   use the name in the Worcester area and you just left it
14   alone?
15          MR. DUDA:  Yes.
16          THE COURT:  Did you just leave it alone by
17   agreement or you just decided not to be involved?
18          MR. DUDA:  I think it's most accurate to say we
19   decided not to be involved; not to pursue the matter
20   further I think is the way we would describe it.
21          THE COURT:  Okay.  You've argued to me about the
22   potential for irreparable harm.  What about balance of
23   hardships and public policy?
24          MR. DUDA:  Well, certainly on the balance of
25   hardships, Your Honor, we're talking about Baystate's core

mark.  It is its most important mark.  If Baystate cannot

prevent another entity providing healthcare services from

coming into its back yard and using its mark, that mark is

going to become meaningless.  So we're talking about a

critical issue to Baystate to protect that mark.

I think the issue of balance or public interest goes

right into that, and that is that Baystate's interest is

the same as the public's interest.  The public needs to

know when it goes into a Baystate facility that it's going

into a facility that's controlled by Baystate.  It's been

here for 40 years.  It has a reputation.  It has -- you

know, I think people can certainly trust what they're

going to get going into Baystate.

I don't really -- I'll let Bay State Physical Therapy

counsel address the issue, but the hardship to the

defendants appears to be, particularly in light of the

hardships to the public and to Baystate Medical, to not be

significant.  This is a single facility we're talking

about affecting, and we're talking about simply not using

the Bay State name at that single facility that it opened

just a few months ago.

THE COURT:  So Bay State Physical Therapy

started I think started somewhere around 1995.  Was

Baystate Health involved in the physical therapy business

around that time?

1          MR. DUDA:  Certainly, Your Honor.  Yes, it was.

2     The one indication that we've shown in the exhibit is

3     Wally Garstka there who talks about having cardiac

4     rehabilitation services since his initial procedures back

5     in 1994.  And then within a couple of years Baystate had

6     registered the mark Baystate, Baystate Rehabilitation

7     Care, which is a continuation of its physical therapy

8     services.

9        Baystate has provided comprehensive medical services

10    and physical therapy services virtually since its

11    beginning and, in fact, the history of Baystate goes back

12    well before 1976.  Its predecessor organization was

13    Women's Wesson Hospital and the like and so physical

14    therapy is not new.

15          THE COURT:  I'm sorry, the predecessor

16    organization was what?

17          MR. DUDA:  I'm talking a little bit out of

18    school right now, but I believe it was called -- there was

19    Wesson Women's or Wesson, I believe it's Wesson's

20    Medical.

21          THE COURT:  Wesson Women's is that what it was?

22          MR. DUDA:  I believe.

23          THE COURT:  It's just an interesting part of

24    Springfield history that I was trying to remember myself.

25    Okay.

1          MR. DUDA:  Anyway it goes way back, and Baystate

2    is the outgrowth of that and the Baystate mark came about

3    after Wesson and another facility were merged.

4          THE COURT:  Okay.  Tell me about Baystate

5    Health's decision to license the use of its name for

6    things that aren't necessarily involved with Baystate

7    Health System?

8       You don't -- I mean, you're clear you say that's

9    true, you've become involved in licensing agreements with

10   businesses who are doing other work in, to say it

11   generally, the healthcare area allowed them to use

12   Baystate.

13         MR. DUDA:  That's correct, Your Honor.

14         THE COURT:  Tell me about that.

15         MR. DUDA:  Yes, each of those are a trademark

16   license which are not uncommon.  Baystate doesn't do it

17   frequently, but, yes, in a few instances licensed use of

18   its trademark.  But with each license, as with at least

19   any valid trademark license, the licensor controls the use

20   of the mark and oversees the services or products that are

21   provided by that mark.  So that --

22         THE COURT:  How do you oversee it?  Just give me

23   an example that we can talk about for like Baystate what?

24         MR. DUDA:  Well, typically it would be an annual

25   review, a meeting with the other facility and we'd go --

1          THE COURT:  Give me the name of one of the
2    facilities that licensed.
3          MR. DUDA:  I don't know that offhand.  Your
4    Honor, if you don't mind if I ask one of my co-counsel who
5    may have that?
6          THE COURT:  Sure.
7          MR. DUDA:  Lauren, do you have that or, Mary?
8          MS. BONZAGNI:  Baystate Eye is one example.
9          COURT REPORTER:  Who is speaking please?
10         MS. BONZAGNI:  This is Mary Bonzagni.
11         THE COURT:  Thank you.  So Baystate Eye.  Now
12   where is Baystate Eye located?
13         MR. DUDA:  Mary, why don't you answer that
14   question?
15         MS. BONZAGNI:  So they're located on
16   Bicentennial Drive in Springfield.
17         THE COURT:  Okay.  That's the one I was thinking
18   of and they're a license.  They have nothing to do with
19   Baystate Health other than they're using the name?  In
20   other words, there's no doctors that are specifically
21   affiliated, Baystate Health doctors that work at Baystate
22   Eye; is that correct?
23         MS. BONZAGNI:  So there is a requirement in our
24   license agreement that at least one of the doctors has to
25   be affiliated with Baystate Health.

1          THE COURT:  Okay.  What does that mean,

2    affiliated?

3          MS. BONZAGNI:  They have to be -- I'm actually

4    just trying to find the agreement.  I think the

5    requirement was that they have to be able to practice

6    within Baystate Health, within the hospital.

7          THE COURT:  I see.  Okay.

8       Now, what if at Baystate Eye -- and we're talking

9    about the most horrible example possible but it's what

10   we're going through today, COVID-19, someone goes into

11   Baystate Eye for some type of procedure and they contract

12   COVID-19 and it comes out in the media that COVID-19 was

13   passed along at Baystate Eye.

14      Does Baystate Health System get involved in this and

15   try to deal with it and embrace it as this is our problem.

16   We're going to try to make it better.  Or do they step

17   away from it saying we have nothing to do with Baystate

18   Eye?  This isn't our problem.

19          MR. DUDA:  I don't know what the terms of the

20   agreement call for in a situation like that or if the

21   agreement addresses that type of situation, but I would

22   very much mention that Baystate would be involved if one

23   of its licensees had a situation such as that to address

24   the problem.

25          THE COURT:  How often is the license subject to

1    review or renewal?

2              MR. DUDA:  Mary, is everything licensed?

3              MS. BONZAGNI:  This is Mary Bonzagni again.  So

4    this is a yearly review and renewal of each license

5    agreement.

6              THE COURT:  All right.  And Baystate has other

7    doctors.  There's a Baystate OB-GYN group.  Is there a

8    Baystate Physical Therapy related group that's out there?

9              MS. BONZAGNI:  Not that I'm aware of.

10             THE COURT:  All right.  And how does that affect

11   your argument, the fact that Baystate is willing to

12   license the use of its name for peripheral type of

13   healthcare things?  The eye care is a great example to be

14   talking about.  What does that do to your argument and the

15   liklihood of success on the merits, strengthen it or

16   weaken it?

17             MR. DUDA:  Your Honor, I think given that the

18   license, that it's not a naked license but a license which

19   allows Baystate to oversee the use of the mark and the

20   services provided, I think it strengthens the mark.  That

21   is, Baystate is maintaining control of its mark.  It does

22   not want to be in a situation where somebody is using its

23   mark without its oversight or some form of control over

24   that.

25        When somebody comes into territory or comes into

1   Baystate's territory and uses the mark without any

2   affiliation, any contracting oversight by Baystate, then

3   that's dangerous.

4       It's not only -- I mean, it's dangerous for the

5   public and it's dangerous for the patients, but it would

6   result or could result in the loss of any rights Baystate

7   has on its mark because it's allowing its mark to be used

8   not as a designator of particular source of services or

9   services that are under its control but allowing it to be

10  used by anybody.

11      So I think there's a very big difference between

12  allowing use of the mark under license and simply allowing

13  the use of the mark, and I think allowing the use of the

14  mark under license is consistent with its control of the

15  mark.

16          THE COURT:  So how does that affect -- I mean,

17  obviously I think around our area there's a Baystate Rug

18  and Floor Company or there might have been a Baystate car

19  dealership.  Those obviously have nothing to do with

20  Baystate Health Systems so there's no issue there.  But

21  what if a Baystate Chiropractic clinic opened up?

22      It was not called -- it was not called Baystate

23  Physical Therapy but it was called Baystate Chiropractic

24  or Baystate Acupuncture, would that make a difference?  Is

25  it the physical therapy issue that you think is the real

1    link into your healthcare system?

2            MR. DUDA:  Baystate has registered its mark for

3    healthcare services and that describes the scope of the

4    services that it provides under its common law rights

5    also.

6        Baystate provides alternative medicines under its

7    mark.  It provides a wide range of healthcare services so

8    I think if any service is, you know, properly

9    characterized as a healthcare service or physical therapy

10   or chiropractic, acupuncture, it would -- any type of

11   service involving the provision of healthcare services to

12   individuals I think that falls under the Baystate mark and

13   a category that it needs to protect.  It doesn't need to

14   protect carpets or car dealerships.  Clearly consumers

15   know the difference between cars and healthcare

16   services.

17           THE COURT:  Give me one second.  For some reason

18   I lost maybe 20 seconds there.

19           MR. DUDA:  I'm sorry.

20           THE COURT:  And I think it's my issue.  I don't

21   know what's going on.  It hasn't happened before with the

22   phone I'm using.

23       My question had to do with where you started to

24   answer as to would it be different if it was Baystate

25   Chiropractic or Baystate Acupuncture, and you started to

1    answer saying, well, Baystate Health Systems is involved

2    in alternative medical things.  So I really wanted to know

3    is it the physical therapy issue?  Do you treat

4    chiropractic and acupuncture the same way and you started

5    to answer that.

6              MR. DUDA:  Yes, and what I was indicating would

7    be the registration for the Baystate trademark is for

8    healthcare services, and that that accurately describes

9    the scope of services for which the mark designates under

10   common law in western Massachusetts.

11        That Baystate offers a wide range of services, of

12   healthcare services under its mark including alternative

13   type medicines.  And that any type of healthcare service,

14   whether it be chiropractic, acupuncture, midwifery,

15   cardiac care, physical therapy that has to do with the

16   care of individuals, that would fall under the mark and

17   Baystate would seek to protect that.  There's a

18   distinction, as I was pointing out, between that and car

19   dealerships or banks or something like that --

20             THE COURT:  Sure.

21             MR. DUDA:  -- that's clearly not medical care or

22   healthcare.

23             THE COURT:  So Baystate Health argues that Bay

24   State Physical Therapy was in bad faith; was exercising

25   bad faith when they came to the Springfield area using the

1    Bay State name trying to capitalize on the goodwill

2    towards Baystate Health Systems to help them financially

3    and get a foothold here and you're saying that would have

4    been bad faith.

5        How do you make -- how does that argument really hold

6    up if Bay State Physical Therapy has been running this

7    business with that name out in the Worchester/Boston area

8    for as long as they have not relying upon Baystate Health

9    in any way to get a boost for their business?

10           MR. DUDA:  Well, it certainly knew that -- or I

11   think one can properly assume and I think it's not an

12   illogical question to conclude that they knew that

13   Baystate is a well known mark for healthcare services in

14   the Springfield area and western Massachusetts.  And that

15   it just seemed to defy any type of business judgment that

16   you would move into an area with the same mark and not

17   recognize that there's going to be some leverage off of

18   that.

19           THE COURT:  Right, but they have been growing.

20   Their business has been successful in the Worcester and

21   Boston area and so they're growing to the point of now

22   they're covering the whole state.  Quite frankly, they

23   want to cover the whole baystate.

24       There's another term baystate meant something else

25   before it meant Baystate Health Systems.  It is a

1    reference to our state that people understand and have
2    been using for quite some time, and so they've been
3    successful and they're growing their business.
4        I don't know how I infer from this that they were
5    plotting to -- at a time growing their business out east,
6    plotting for a time when they could -- when would be the
7    right time for them to capitalize on Baystate Health
8    System by coming to the Springfield area and maybe pushing
9    out into the Berkshires.  I'm not getting the bad faith
10   there.
11            MR. DUDA:  Well, Your Honor, I'm not suggesting
12   that it's to that extreme that there's been some sort of
13   plot that's been developing over the years, but I think
14   the point was that they had to know that there is going to
15   be likelihood of confusion.
16       They had to know that there was leverage coming off
17   this, and to me this was an effort to, well, we're coming
18   in anyway and we'll see what happens.  You know, if that's
19   not bad faith, it's certainly a calculated step with the
20   knowledge that confusion was likely to occur.
21            THE COURT:  Right.  But, Attorney Duda, they're
22   coming in.  They're growing their business.  Like, good
23   for them.  Their business is that good; they're growing
24   their business.  They're coming in after Baystate Health
25   Systems just let the issue drop in 20008.  It just wasn't

1   pursued about trying to draw some type of line of
2   demarcation where you would be happy with them sitting on
3   one side of the line and you staying on the other side of
4   the line.
5        And then it seems -- tell me if I'm wrong, but it was
6   never brought up again for all these years about trying to
7   renew that, hey, how's everything going?  We're just
8   making sure you're not planning to come to the Springfield
9   area.  That was just dropped in 2008.
10       One of the things Bay State Physical Therapy is going
11  to tell me is that you let that happen for so long never
12  giving any indication that Bay State Physical Therapy
13  shouldn't try to expand their business and that you would
14  bring this issue up if they did try.
15            MR. DUDA:  Well, Your Honor, I suppose they
16  could make that judgment call.  I'm not -- I don't know
17  what kind of judgment they made.  All we know is that we
18  had discussions back in 2008 about that.  Baystate made
19  clear what its concern was, what its area of protection
20  was.  They offered to do a license for payment that Bay
21  State Physical Therapy didn't accept that.  The
22  discussions dropped and there was no further effort to
23  move west and that was fine with Baystate.
24       Now whether Baystate could have contacted them
25  periodically to check on what their plans were, I think

that would have been an unusual step from a business
perspective since there was no indication that they
intended to move into the Springfield area -- into the
western Massachusetts area.  They had been for years in
eastern Massachusetts and Baystate was willing to let that
go.

THE COURT:  Right.  But there could clearly have
been some type of injunctive relief requested or some type
of relief request based upon where they were and your
argument -- your conversations breaking down about them
using it.

You thought they were using your name back then as
well.  And, quite frankly, just because there's a
Worcester -- there's a Hampden County line that ends at
Worcester, you know, that line is blurred.  It doesn't
really mean that people in the Worcester area haven't
heard of Baystate Health Systems.

You know, people in the Springfield area have heard
of Mass. General Hospital Systems, and people out in
Boston have heard of Baystate Health Systems.

My point is that you just let it go and you just let
them continue without doing anything.  So when I'm
assessing likelihood -- I mean, liklihood means something.
Likelihood of success on the merits, that means something.

Clearly you may end up prevailing and winning on your

1    ultimate underlying suit, but I have to make a finding

2    that you are likely and here I'm looking at this issue of

3    you just allowing -- Baystate Health allowing this to

4    happen over all these years.  To me it seems like the

5    weakest part of your case and so I'm giving you a chance

6    to address it again.

7        MR. DUDA:  Well, to bring it back to what our

8    case is we're talking about western Mass. and that there's

9    common law rights that have been established in this area,

10   in this trade area.  Those rights were not waived by

11   discussions with Bay State Physical Health in 2008.  They

12   weren't waived by allowing Bay State Physical Health to

13   continue to operate for years in eastern Massachusetts.

14   That's the reality and that they weren't here in this

15   territory and that's --

16       THE COURT:  But you didn't allow them to

17   operate.  You didn't -- you didn't do anything.  You had

18   no control.  You did not allow them to operate.  They

19   operated on their own.  That's something separate, apart,

20   and aside using the same name.  It wasn't because you

21   allowed them to do it.  They just did it.

22       You didn't take any legal action to stop them from

23   coming into your area or using your name in the Worcester

24   area.  And it's just I don't buy that it's on the

25   Worcester area there's such a line of demarcation that no

1    one has ever heard of Baystate.  Of course, they have.

2    Everyone has heard of Baystate Health Systems throughout

3    this entire state.

4         So, you know, could just coming over from Worcester,

5    I don't know that you needed to allow it or have the right

6    to disallow it because you ignored it.

7              MR. DUDA:  If I used the word "allow," I don't

8    -- perhaps that's the wrong word.  But again, what we did

9    not allow and what did not happen is their operation in

10   our trade area.

11        People may have heard of Baystate out in eastern

12   Mass. but that's not Baystate's trade area; that's not

13   where its market is; that's not where the consumers are

14   that are using Baystate services, and it's not the

15   consumers that are going to be confused by Bay State

16   Physical Therapy providing services in Baystate's own back

17   yard right now, and at this time it's a critical time to

18   stop that.

19        Maybe whatever happened in eastern Mass. happened in

20   eastern Mass. and that may be a part of this litigation,

21   but right now we're talking about this area where I think

22   it's clear that Baystate has established its common law

23   rights to the use of the mark and it's this trade area.

24   This is the trade area we're talking about.

25             We're not -- in the same way in the *Thrifty*

1    *Rent-A-Car v. Thrift Car* case, Thrift Car had rental cars

2    in Nantucket or had people going out in that area and the

3    court said, well, no, we're not going to protect there and

4    that's not an issue.  Thrifty National Car Rental could

5    take that territory, but East Taughton that is Thrift

6    Cars' area.  That's their core area.  That's where their

7    consumers are and they are going to protect it.  We're

8    going to stop *Thrifty Car* from going in there, and the

9    same thing with *Dorpan* with the *Melia Hotel* there.  It's

10   the same idea.

11        It still goes back to protecting consumer confusion

12   and that's the point.  This isn't -- you point out this

13   isn't just a matter of a property right or a patent or a

14   copyright where we can get damages later on.

15        This is the use of a mark and what it means to

16   consumers so that they don't get confused about a mark in

17   this area.  I don't think the fact that whatever happened

18   in eastern Mass. during negotiations or we didn't pursue

19   things out there affect the fact that people are going to

20   be confused here and now --

21             THE COURT:  Well, again, Attorney Duda, I'm just

22   doing my analysis here just based on the facts for

23   injunctive relief.

24             MR. DUDA:  I understand.

25             THE COURT:  And I agree -- I think I agree the

1    most with the arguments you made as to this liklihood of

2    confusion.  I think there is some likelihood of confusion

3    just by hearing the name phonetically.  You just hear it

4    and the first thing you think of is -- I mean, in the best

5    sense Baystate Health wants to think the best thing you

6    think of is the integrity of Baystate Health Systems and

7    someone would choose that physical therapy place thinking

8    that the integrity of Baystate Health Systems is standing

9    behind it.  I think that's a good argument.

10        All right.  What else do you want to say before we

11   move on to Bay State Physical Therapy's argument?

12            MR. DUDA:  I think that's it, Your Honor.  I

13   think we've covered everything.  Thank you very much.

14            THE COURT:  All right.  Thank you.

15       Is it Attorney Wheatley for Physical Therapy?

16            MS. WHEATLEY:  Yes, Your Honor.  This is Lucy

17   Wheatley for Physical Therapy.  I thought I would just go

18   through some of the points that Mr. Duda made and Your

19   Honor made in his argument that I think are important to

20   clarify.

21       Mr. Duda pointed to the Thrifty Car Rental case and

22   the *Dorpan v. Hotel Melia* case as being authority here and

23   suggested, you know, that the court should disregard the

24   prior Baystate cases which we think are certainly on

25   point.

1          There's important facts recognized about the *Thrifty*

2   *Car* case.  First, in that case likelihood of confusion was

3   conceded and those parties' rights -- so those parities'

4   rights to their respective marks were not challenged

5   except with respect to the geographic scope of those marks

6   and whether an injunction was appropriate.

7          Likelihood of confusion is not conceded here; nor is

8   Baystate Health's right to use their mark, prior rights to

9   use their mark with physical therapy conceded here.  Both

10  *Dorpan* and *Thrifty Cars* did not involve a geographically

11  descriptive mark and that is a key distinguishing factor

12  because when you choose to use a mark like Baystate, which

13  is a common nickname for Massachusetts, you have a higher

14  burden.  You have to prove secondary meaning and you have

15  to prove secondary meaning prior to the alleged offenders'

16  first use of that mark.

17         My client's first used their trademark Bay State

18  Physical Therapy in 1995.  Plaintiff has not put forth any

19  evidence whatsoever that shows secondary meaning prior to

20  that date and, frankly, they have not put forward enough

21  evidence to show secondary meaning period.

22         Normally --

23              THE COURT:  They're telling me -- Attorney Duda

24  is telling me they were involved in the respiratory

25  therapy/physical therapy field going back that far.

1          MS. WHEATLEY:  Yes, Your Honor.  I wanted to

2   address that.  The lone piece of evidence they provided on

3   that was their Exhibit 38, which is a 2019 article about a

4   man who received heart surgery at Baystate Hospital and it

5   mentions he had one surgery in 1994 and that he received

6   cardiac rehabilitation services.

7          Mr. Duda says the court should just assume that means

8   he got physical therapy and that Baystate Health was using

9   its mark in connection with physical therapy.  I would

10  submit that an article that doesn't even mention the term

11  physical therapy and is talking about heart surgery

12  absolutely is not sufficient to prove common law rights in

13  Baystate in connection with some physical therapy.

14         The other piece of evidence Mr. Duda directed you to

15  was a state trademark registration from 1999.  It is

16  notable that that state trademark registration claims a

17  first use date in connection with physical therapy in

18  1996, which would be after my client's first use in 1995

19  which would mean my client and not Baystate Health has

20  prior rights in physical therapy.

21         So this evidence here is certainly not sufficient to

22  establish common law rights in connection with physical

23  therapy and, as Mr. Duda concedes, that's the burden they

24  have to meet here.  They have to prove these common law

25  rights in connection with the services they are

1   challenging Bay State's use with.

2            THE COURT:  So is Bay State Physical Therapy the

3   type of physical therapy that I'm envisioning that after

4   you have knee surgery, you have shoulder surgery, you have

5   some type of injury and you need to strengthen a joint, a

6   bone, a muscle, a ligament, et cetera, that's where you

7   go?  Or does Bay State Physical Therapy are they involved

8   in things like respiratory therapy, which seems like a

9   specialty in and of itself?

10           MS. WHEATLEY:  So they have free-standing

11  locations and they also are located in YMCA gyms.  On

12  their website the list of services is "cupping, dry

13  needling, IASTM, kinesio taping, manual therapy."  The

14  areas of specialty are "aquatic therapy, chiropractic

15  services, dance medicine, occupational therapy" --

16           COURT REPORTER:  A little slower please.

17           MS. WHEATLEY:  I apologize.  "Parkinson's,

18  pediatric sports industry -- injuries, pediatric physical

19  therapy, pelvic women's health, post-concussion therapy,

20  vestibular therapy."

21       So I don't see anything that would relate it to

22  either respiratory therapy or, you know, cardiac services.

23  This is a fairly distinct field and particularly the

24  location in gyms gives you an idea of the type of physical

25  therapy they specialize in.

```
1              THE COURT:  Attorney Wheatley, where is it
2     located in Springfield?  Now where are they located?
3              MS. WHEATLEY:  They are at 1739 Allen Street.  I
4     could not tell you where that is in relation to Baystate
5     Health, though I would point out that Bay State Physical
6     Therapy has been outside of the greater Boston area for
7     some time.  They have locations in Westborough, Franklin,
8     Providence, North Attleborough.  All of those locations
9     are under 60 miles from Springfield, much less Baystate
10    Health's other locations.
11         Another point Your Honor raised was whether Baystate
12    Health has locations in the Boston area and Mr. Duda said
13    they had reference laboratories.  I think he said they
14    didn't provide medical services.  These laboratories are
15    consumer spacing laboratories where patients go to get
16    blood draws and seek tests and so I would certainly say
17    that is a medical service.
18         It's a consumer spacing medical service, and so
19    Baystate Health and Bay State Physical Therapy have been
20    side by side in Boston for many years without apparent
21    harm or confusion, which I would also say suggests that
22    Baystate Health has acquiesced to Bay State Physical
23    Therapy's use and that there is no urgency here or
24    irreparable harm to issue a preliminary injunction.
25         An additional point I wanted to address that was
```

1    brought up was the issue of the other Baystates in the

2    healthcare field.  Certainly Baystate is an extremely

3    common name and there are I think thousands of Baystates

4    in Massachusetts.  There are also many Baystates in

5    Springfield.  They are also other Baystate medical

6    practices in Springfield.

7         Defendants we pointed out these other Springfield

8    Baystates and defendants bore the burden to show that

9    those did not weaken their rights.  What they provided

10   were very heavily redacted license agreements.  It's

11   impossible to tell because of all the redactions whether

12   these are actually valid licenses, but what we can see is

13   that all three of these licenses were created in the

14   context of each of these practices using Baystate on their

15   own and Baystate Health accused them of infringement and

16   then they signed this agreement.

17        So there's no indication that Baystate Health

18   actually controls these locations and, in fact, they use

19   different logos and they are not listed on the Baystate

20   Health web page as Baystate Health locations.  So I think

21   it's very telling that Baystate Health even in Springfield

22   has apparently tolerated other Baystates.

23            THE COURT:  Well, they're telling me that the

24   licensing agreements -- I mean, that's true.  I think they

25   are tolerating it, but they're tolerating it they tell me

1    under a licensing agreement that at least gives Baystate

2    Health some type of control including having someone in

3    the organization using their name have to have practicing

4    rights at Baystate Health.

5        And in answer to the question, well, what if one of

6    these Baystate Eye Care or Baystate something else, what

7    if someone -- what if it was in the media that someone

8    contracted COVID there, would Baystate Health Systems be

9    concerned and get involved in it?  Attorney Duda said,

10   yes, he thinks Baystate Health would be involved.  That

11   shows some degree of oversight and control and them being

12   involved in the licensing, at least that's the argument

13   being made by the attorney.

14           MS. WHEATLEY:  Yes, Your Honor, and I agree that

15   was the argument made by the attorney though since they

16   failed to actually provide the unredacted license

17   agreement that would indicate whether that is in fact the

18   case, I don't think they have proved that.

19       And the fact that these were free-standing existing

20   locations for many years prior to allegedly becoming

21   licensees at the very least shows that consumers in the

22   Springfield area are used to there being multiple

23   Baystates within the healthcare field quite recently.

24   These licenses are all from 2005.

25           THE COURT:  Okay.  That's a good point.

1    Did you give me -- is there evidence -- I didn't look

2    at this last night so I don't know.  Did you give me

3    pictures of your logos and your lettering and your color

4    scheme and all that for comparison to Baystate Health?

5         MS. WHEATLEY:  We provided a copy of our

6    incontestable federal trademark registration which does

7    show the logo that Bay State Physical Therapy uses and

8    that's the logo that they are using on the Springfield

9    location.  Baystate Health also provided a copy of Bay

10   State Physical's Therapy web page and so that pretty

11   accurately shows the way the mark is used.

12   I would note again the fact that Bay State Physical

13   Therapy is the only party here who has an incontestable

14   trademark registration in connection with physical therapy

15   is very significant.

16   Ordinarily that provides us with a conclusive

17   evidentiary presumption of the exclusive right to use.

18   The only way to overcome that is to prove prior common law

19   rights, which means that Baystate Health faces the heavy

20   burden here.  They have to prove this and the evidence

21   they've put forward just does not even come close.  They

22   have not in fact --

23        THE COURT:  Just because I'm curious -- I think

24   I know what the answer is -- but is there anything on your

25   website or your paperwork or your patient sign-in

1    information, you know, when you have to go there and you

2    have to write all your information before you're seen, is

3    there anything that says Bay State Physical Therapy is not

4    affiliated with Baystate Health Systems?

5              MS. WHEATLEY:  No, Your Honor.  I don't believe

6    there is and, frankly, I would say that there's never been

7    any indication that's necessary both because Baystate is a

8    very common name but also because Bay State Physical

9    Therapy has existed since 1995.  It has 60 locations.

10   It's also outside of Massachusetts, and as part of the

11   evidence actually that plaintiffs produced Bay State

12   Physical Therapy shows up first on the Google result if

13   you Google Bay State Physical Therapy.  So to the degree

14   anyone has secondary meaning in the mark Baystate, I would

15   suggest it is Bay State Physical Therapy.  It's quite well

16   known.

17        The idea of sort of that these are in significantly

18   different geographies, I mean, first as you pointed out,

19   they do have locations in Boston and so they're not

20   actually in different geographies.  But the distances here

21   we're talking about everyone here is within less than a

22   hundred miles of each other.

23        The *Thrifty Rent-A-Car* case, for instance, initially

24   involved a remote junior user who was in Oklahoma or the

25   Thrifty Rent-A-Car was in Oklahoma and the junior user was

1    in Massachusetts.  That's not what happened here.

2    Everyone here was operating in Massachusetts at the same

3    time together for over 25 years.

4            THE COURT:  Is there presently a Baystate

5    Physical Therapy?  Maybe there's one at the hospital or

6    maybe some satellite offices.  Is there a Baystate

7    Physical Therapy?

8            MS. WHEATLEY:  I'm sorry?

9            MR. DUDA:  I'm sorry, is there something that's

10   called Baystate Physical Therapy?

11           THE COURT:  Right.

12           MR. DUDA:  Mary, I don't know what the names

13   are.  We have a number of facilities that provide physical

14   therapy.  I'm not sure what --

15           THE COURT:  Or Baystate Rehab; Baystate Rehab

16   Services, something like that?

17           MR. DUDA:  Mary Bonzagni, could you answer that?

18           MS. BONZAGNI:  So there is a Massachusetts state

19   registration for Baystate Rehabilitation Care which we've

20   already mentioned.

21           MR. DUDA:  And that's since 1999.

22           MS. BONZAGNI:  The first use date I think of

23   1996, and that date was the date in which that word mark

24   was used on physical therapy type services.

25       I know that what we had argued in the past is that

1    these types of services were offered by Baystate within

2    their hospital setting and so that would be physical

3    therapy services offered under the Baystate brand.

4            THE COURT:  So arguably Attorney Wheatley would

5    say that if you did open a satellite, a group of satellite

6    or standalone physical therapy locations and said this is

7    Baystate Physical Therapy doing sports medicine type

8    physical therapy after knee surgery at Baystate, then

9    arguably Attorney Wheatley would say you would need the

10   permission of Bay State Physical Therapy to do so.  Would

11   be that right, Attorney Wheatley?

12           MS. WHEATLEY:  Yes, Your Honor.  And I just

13   looked at the Baystate Health website and they do seem to

14   use Baystate Rehabilitation Care as their name.

15           THE COURT:  I'm not seeing how that's exactly

16   the same as physical therapy.  Is that my problem?  Am I

17   missing something?  Why am I just not seeing that it's the

18   same?

19           MR. DUDA:  For trademarks when you just tag on a

20   generic term like physical therapy essentially adds

21   nothing to the demarcation.  The fact that it's Baystate

22   Physical Therapy or Baystate Rehabilitation Care is not

23   the point.  The point is that it's Baystate and Baystate

24   covers healthcare services which includes physical therapy

25   and very much includes services that the defendants --

1          THE COURT:  But it's a type of healthcare I'm

2     not sure Baystate Health Systems has been involved in.

3          I just don't see rehabilitation -- when I think of

4     rehabilitation services, I think that when you've had --

5     let's talk about heart surgery.  When you've had

6     open-heart surgery or you've had some type of major

7     surgery and you need to go to a location and be rehabbed

8     essentially and stay there and need some intense

9     rehabilitation, that's where you go.

10         I don't think of rehabilitation in that sense being

11    located in gyms and at the Y and, you know, offering

12    instructions about what you do after you work out and what

13    type of workouts.  I'm just seeing a difference.  I'm

14    happy to consider otherwise and consider your argument

15    that I'm mistaken, but I'm just seeing Baystate

16    Rehabilitation different from Bay State Physical

17    Therapy.

18              MR. DUDA:  Your Honor, the description that Bay

19    State Physical Therapy provides for the services provided

20    by its mark is "physical therapy evaluation,

21    identification, and management of movement dysfunction to

22    restore, maintain, and promote optimum physical function

23    preventing the onset symptoms and progression of

24    impairments, functional limitations, and disabilities

25    resulting from disease, disorders, conditions, or

1    injuries."

2        That is what Baystate provides and we submitted an
3    affidavit, which I don't think was contested, from Mr.
4    Woodly that states precisely that those services are
5    exactly in the scope of Baystate's services and has been
6    for several decades.

7        THE COURT:  Okay.

8        MR. DUDA:  So we're not in two different worlds
9    here.  We're in one in the same world.  Baystate provides
10   physical therapy services, whether you want to call it
11   rehabilitation or the like.

12       I think the evidence in the record would substantiate
13   that indeed we provide what Bay State Physical Therapy
14   itself describes as its services.  We provide every one of
15   those and fits the description of services provided under
16   the trademark and describes the services that we provide
17   and that's supported by affidavit.

18       THE COURT:  Okay.  Attorney Wheatley, we'll pick
19   back up with you and what do you want to say about -- do
20   you want to start touching on the liklehood of success on
21   the merits and the irreparable harm issue?

22       MS. WHEATLEY:  Yes, Your Honor.

23       So with respect to likelihood of success on the
24   merits, I think the most salient point is that for the
25   same reasons that there was no success in the prior

1   Baystate cases, Baystate here is not going to be able to

2   show secondary meaning prior to my client's first use of

3   Bay State and fundamentally that means they cannot win

4   their case.  And frankly in the other Baystate case there

5   were consumer surveys on the record.  There was much more

6   persuasive evidence and we have none of that here.

7       And just to address Mr. Duda's point about the

8   services and that's with respect to what is on the record,

9   Mr. Duda agrees here that we are in the realm of common

10  law rights.  The description he read was from our

11  incontestable trademark registration for physical therapy

12  which we rely on but Mr. Duda bears the burden to show use

13  of his mark, of his client's mark in connection with those

14  particular services and there is no evidence of that on

15  the record.  There really isn't.

16      The one article they direct you to, Exhibit 38,

17  doesn't -- it talks about cardiac rehabilitation care

18  which, to my knowledge, my client doesn't offer.  It does

19  not seem to me the sort of thing you would get at a gym.

20  So I do believe that these are distinct services and again

21  since we have the incontestable trademark registration, it

22  is Baystate Health's burden to prove their common law

23  rights and our exact services and they haven't done that.

24      The other main point on likelihood of success on the

25  merits is the acquiescence and *Laches* issue here.  This

1   issue was first raised in 2008.  So Baystate Health had

2   notice of my client's activities at least as early as

3   2008, and we've produced the complete correspondence

4   between the parties.

5        In 2008 Bay State Physical Therapy strongly contested

6   that Baystate Health had rights to stop my client from

7   using the mark Bay State Physical Therapy.  They wanted to

8   avoid litigation so they did consider entering into some

9   sort of agreement and then ultimately the negotiations

10  dragged on for over a year.  Ultimately they decided not

11  to enter an agreement and Baystate Health recognized that.

12       They actually sent a letter where they said "Where we

13  have not received a response to our letter to you dated

14  May 21, 2009, we assume that Bay State Physical Therapy of

15  Randolph is no longer willing to resolve the above

16  referenced matter by entering into a license agreement

17  with Baystate Health.  Please confirm that our

18  understanding is correct."

19       So they very clearly understood that there was no

20  agreement and that my client did not agree to do anything,

21  and then in the intervening 12 years my client opened 40

22  locations.  There was rapid expansion here.

23       My client also secured a federal trademark

24  registration for Bay State Physical Therapy which gave

25  them nationwide rights that Baystate Health did not

1    oppose.  Not only did they not oppose it, they let it go

2    incontestable.

3         So there's significant acquiescence here and while

4    this is my client's first location in Springfield, it is

5    not their first location outside of Boston.  They've been

6    steadily expanding westward and Baystate Health just sat

7    on its hands and let them do that and let them invest more

8    and more in this trademark.

9         So I don't think they can overcome acquiescence and

10   *Laches* and ultimately win on the merits here and

11   particularly not with respect to the trade area they

12   demand which is all of western Massachusetts.

13        Frankly based on the -- the trade area they ask for

14   would basically put them 75 miles out into western

15   Massachusetts from Springfield.  Well, if you do 75 miles

16   out from my client's preexisting locations, which they do

17   not challenge, you're in Springfield.  So I would say the

18   trade areas already overlap here.  They've overlapped for

19   some time and that also further means they cannot succeed

20   on the merits.

21        With respect to the irreparable harm prong,

22   defendants did not put forth -- they put forth attorney

23   argument.  They did not put forth any evidence of

24   irreparable harm.  They didn't even put forth a client

25   declaration attesting to irreparable harm, and again this

1    is their burden and they're the one seeking to change the

2    status quo here.

3        For there they have to make a showing of harm and

4    they have not done so, and the long, long delay certainly

5    undercuts any harm.  And requiring my client to take

6    in-person action in the midst of a pandemic certainly

7    creates harm for my client and it also means that my

8    client's customers who are familiar with the Bay State

9    Physical Therapy brand, because it is throughout

10   Massachusetts and it is a well-established brand that has

11   a website, are not going to be able to find the

12   Springfield location which is a serious harm in itself.

13       I would also say on the delay even if we're only

14   talking about Springfield, there's still been an

15   eight-month delay and a number of courts have found that

16   even an eight-month delay is enough to justify denying a

17   motion for preliminary injunction.

18             THE COURT:  All right.

19        Okay.  Attorney Duda, did you want to respond

20   briefly?

21             MR. DUDA:  Yes, Your Honor.  There's so much

22   there.

23        First of all, what it seems is suggested by defense

24   counsel flies in the face of the First Circuit precedent

25   of *Thrifty Rent-A-Car* suggesting that somehow *Thrift Car*

1   was supposed to have brought a lawsuit against _Thrifty_
2   _Rent-A-Car_ earlier than when _Thrifty Rent-A-Car_ came into
3   their territory, it's just not the law.

4       The fact of the matter is that we're talking about a
5   specific trade area, western Massachusetts, and the rights
6   to a trademark in that area.  The rights to that trademark
7   are not waived by not enforcing it outside of that trade
8   area.  This is the trade area.

9       The fact that there may be reference laboratories in
10  eastern Massachusetts does not impact the fact that the
11  trade area that we're concerned about is western
12  Massachusetts and this is where the harm is going to be
13  done and there's going to be harm to individuals and harm
14  to Baystate if Physical Therapy is allowed to use the mark
15  in this area, number one.

16      Number two is counsel repeatedly refers to Bay State
17  Physical Therapy having an incontestable mark.  The
18  Baystate mark has been incontestable for much longer than
19  Bay State Physical Therapy.  Baystate has been an
20  incontestable registered mark for some time.  That's a
21  different issue than what we're trying to get at here,
22  what we're trying to talk about the local area.

23      The fact that it's 75 miles from Springfield
24  measurement is irrelevant.  We're not talking about a
25  single facility in Springfield.  We're talking about

1    facilities throughout western Massachusetts where Baystate

2    has established healthcare facilities.

3        Finally this idea that we waited eight months is just

4    not correct.  We have indicated in our filings we found

5    out in November.  There's a couple months of discussions.

6    The lawsuit was filed in March and a preliminary

7    injunction motion was filed in April.  We moved as quickly

8    as we can to try to prevent the harm that's happening

9    right now in this area, Your Honor.

10       And finally on the physical therapy being

11   indistinguishable or being distinguishable from healthcare

12   services, I just think it flies in the face of definition

13   of healthcare services.  It flies in the face of the way

14   they describe their own physical therapy services.

15       That the issue is not whether we can break it down

16   somehow by what our thoughts are on what happens in a gym.

17   What is important is what a typical consumer is going to

18   understand.  When they see Bay State Physical Therapy, the

19   idea is that that's Baystate and it's physical therapy.

20   It's within healthcare services and the likelihood of

21   confusion I think is high.  We've shown some evidence of

22   that already happening, and as we indicate in our brief

23   even the slightest amount of actual confusion evidence is

24   very persuasive.  It's happening.

25       Your Honor, I'll leave it at that.  I'd just ask the

1  court to please consider the potential harm that's going

2  to happen not just to Baystate but to the community if

3  this is allowed to go on.

4          THE COURT:  All right.  Attorney Wheatley, do

5  you want to take 30 seconds?  You don't have to but if you

6  just wanted to wrap up.

7          MS. WHEATLEY:  Thank you, Your Honor.

8      Just a couple of brief points.  One, back to the

9  *Thrifty Car* case, again that involved a remote junior user

10  who did not have an incontestable trademark registration.

11  I won't get too much into the technicalities and again

12  where likelihood of confusion was conceded but it was a

13  very different case and the parties did in fact come into

14  conflict as soon as they were both in Massachusetts.  They

15  started off in Oklahoma versus Massachusetts so, you know,

16  that was a different situation.

17      Second, on the point of Baystate Health having an

18  incontestable trademark registration, the registration is

19  not -- or an incontestable registration is not for

20  physical therapy services.  And more to the point, the

21  fact that both parties were able to secure registrations

22  from the USPTO indicates that the USPTO does not think

23  there is a likelihood of confusion here, which is

24  persuasive evidence that a preliminary injunction should

25  not be issued.

1    Defendant -- plaintiff has also not produced any

2    authority that trademark rights should be divided up town

3    by town within the state of Massachusetts, and they

4    haven't really produced any evidence explaining how the

5    court is supposed to delineate the trade areas here given

6    the distances are so close.

7        And just the final point I would raise is the

8    plaintiffs conceded they're talking about common law

9    rights.  To prove -- and Attorney Duda has said they have

10   common law rights in all healthcare services.  That is

11   something that they have to prove.

12       They actually have to show prior use in connection

13   with the services they are talking about.  They can't rely

14   on a registration that simply says healthcare services.

15   And there is no record -- evidence on the record that the

16   court could use to make the determination that they have

17   made that showing and so we would submit that the

18   injunction should be denied.  Thank you.

19             THE COURT:  All right.  Okay.  To all parties,

20   thank you very much for your written materials and for

21   your arguments.  The matter is under advisement.

22             MR. DUDA:  Thank you, Your Honor.

23             MS. WHEATLEY:  Thank you.

24             THE COURT:  All right.

25   **(Hearing concluded at 10:39.)**

1    (The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
2    direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
3    any reproduced copies not made under my control or
direction.)

4

5                           CERTIFICATION

6

7              I certify that the foregoing is a correct

8    transcript of the record of proceedings in the

9    above-entitled matter to the best of my skill and ability.

10

11

12

13    /s/ Alice Moran                    February 24, 2021
     Alice Moran, RMR, RPR
14    Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25